1

2                    **UNITED STATES DISTRICT COURT**

3                        **DISTRICT OF OREGON**

4                        **PORTLAND DIVISION**

5

6   SAVINA R. WHITNEY,              )
                                    )
7                 Plaintiff,        )    No. 03:10-cv-01403-HU
                                    )
8   vs.                             )
                                    )
9   MICHAEL J. ASTRUE,              )  **FINDINGS AND RECOMMENDATION**
    Commissioner of Social Security,)
10                                  )
                  Defendant.        )
11
                      _____
12

13

14  Tim D. Wilborn
    Wilborn Law Office, P.C.
15  P.O. Box 2768
    Oregon City, OR 97045
16
         Attorney for Plaintiff
17

18  S. Amanda Marshall
    United States Attorney
19  Adrian L. Brown
    Assistant United States Attorney
20  1000 S.W. Third Avenue, Suite 600
    Portland, OR 97204-2904
21

22  David Morado
    Regional Chief Counsel
23  Region X, Seattle
    Keith Simonson
24  Special Assistant United States Attorney
    Social Security Administration
25  Office of the General Counsel
    1301 Young Street, Suite A-702
26  Dallas, TX 75202

27       Attorneys for Defendant

28

1 - FINDINGS & RECOMMENDATION

1
2
3
4
5 HUBEL, United States Magistrate Judge:

6      The plaintiff Savina R. Whitney seeks judicial review pursuant

7 to 42 U.S.C. § 405(g) of the Commissioner's final decision denying

8 her applications for Disability Insurance ("DI") benefits under

9 Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and

10 Supplemental Security Income ("SSI") under Title XVI of the Act.

11 Whitney argues the Administrative Law Judge ("ALJ") erred in

12 failing to evaluate her mental residual functional capacity

13 properly, finding her testimony to be less than fully credible,

14 improperly rejecting a lay witness's statement, and improperly

15 concluding that Whitney is able to work. *See* Dkt. ##15 & 20.

16
17                   *I.  PROCEDURAL BACKGROUND*

18      Whitney protectively filed applications for DI and SSI

19 benefits on April 24, 2007, at age 39, claiming a disability onset

20 date of November 1, 2006. (A.R. 135-37, 143-45[1]) She later

21 amended her application to claim a closed period of disability

22 between November 1, 2006, and June 30, 2008. (A.R. 37) Whitney is

23
24         [1]The administrative record was filed electronically using the

25 court's CM/ECF system. Dkt. #11 and attachments. Pages of the
record contain three separate page numbers: two located at the top

26 of the page, consisting of the CM/ECF number (e.g., Dkt. #11-6,
Page 15 of 24), and a Page ID#; and one located at the lower right

27 corner of the page, representing the numbering inserted by the
Agency. Citations herein to "A.R." refer to the agency numbering

28 in the lower right corner of each page.

2 - FINDINGS & RECOMMENDATION

5'7" tall, and at the time of her applications, she weighed 138 pounds. (A.R. 161) She claims she was disabled during the closed period due to bipolar disorder and "3 herniated discs" which cause low back pain. (A.R. 162)

Whitney's applications were denied initially and on reconsideration. (A.R. 76-79, 80-88) She requested a hearing (A.R. 97), and a hearing was held on March 29, 2010, before an ALJ. (A.R. 32-75) Whitney was represented by an attorney at the hearing. (*See* A.R. 32) Whitney testified at the hearing, and a Vocational Expert ("VE") also testified. *Id.* On August 19, 2008, the ALJ issued his decision, finding that although Whitney has severe impairments that prevent her from returning to any of her past relevant work, she retains the residual functional capacity to make a successful adjustment to other work, citing examples of semiconductor assembler, surveillance monitor, and meter reader. The ALJ therefore concluded that Whitney was not disabled during the closed period at issue. (A.R. 15-27) Whitney appealed the ALJ's decision, and on September 10, 2010, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

Whitney filed a timely Complaint in this court, seeking judicial review of the Commissioner's final decision. Dkt. #2. Whitney filed a brief in support of her request for review on August 20, 2011. Dkt. #15. The Commissioner filed a responsive brief on October 24, 2011. Dkt. #17. Whitney filed a reply on November 9, 2011. Dkt. #20. The matter now is fully briefed, and I submit the following Findings and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

3 - FINDINGS & RECOMMENDATION

## II.  FACTUAL BACKGROUND

### A.  Summary of the Medical Evidence[2]

On November 16, 2006, Whitney was seen by psychologist Wendy Bourg, Ph.D. at Summit Research (Oregon) Inc., to be evaluated for inclusion in a clinical trial of a medication for bipolar disorder. Whitney was noted "to be in a manic state," with rapid, pressured speech; jumping from topic to topic; darting eyes; and fair to poor judgment.  She was diagnosed with "Bipolar disorder, manic state, moderate to marked," and her screening interview and testing indicated she met the criteria for inclusion in the medication study.  (A.R. 233, 239; see A.R. 234-40; 272)  She began participation in the study, and by December 13, 2006, she and her partner, Gail, reported that she was "very much improved, virtually all the way well."  (A.R. 251)

On December 19, 2006, Whitney reported continued improvement in her mood and other symptoms, but noted she was experiencing afternoon fatigue.  (A.R. 252)  Similarly, on December 27, 2006, she reported that all of her symptoms were improved except for energy and motivation.  Her dosage of Abilify was decreased in an attempt to alleviate her fatigue, but the fatigue persisted, and Whitney was still complaining of fatigue on January 2 and 11, 2007. (A.R. 253, 256-58)  Her Abilify dosage was increased again, and on January 25, 2007, she reported being "virtually symptom-free." (A.R. 259)  On February 15, 2007, Whitney "came in with her partner

---

[2]Because Whitney is seeking a disability determination for the closed period from November 1, 2006, to June 30, 2008, medical treatment records dated 12/02/1994 to 12/28/2001, from Sierra Park Clinics are not summarized here.  (See A.R. 323-61)

4 - FINDINGS & RECOMMENDATION

and both were in good moods.  They were both talking and laughing a lot."  Whitney reported "no depressed mood but some irritability and lassitude."  (A.R. 265)  Her participation in the study ended in March 2007.  She entered an aftercare program at her "optimal" medication dosage of Abilify 30 mg and Lamictal 100 mg.  (A.R. 272)

Whitney was seen in the aftercare program for a recheck on May 2, 2007.  She reportedly had "developed a gastroenteritis illness," and had discontinued the Lamictal "abruptly."  (A.R. 316) She was started on Zoloft, but it "made her feel angry, irritable, and flat," so after five days, she resumed taking Lamictal along with the Zoloft.  The drug combination did not improve her symptoms, so she discontinued the Zoloft and continued on the Lamictal. She reported ongoing fatigue.  (*Id.*)

On May 12, 2007, Whitney was seen by William Hills, M.D., a board-certified neurologist, for a consultative physical examination.  (A.R. 273-78)  Whitney provided the following history:

> [I]n approximately 1994 or 1995 she had herniated 2-3 disks in her lower back; she states L3-L5.  She was seen by a physician in California and was told that she needed surgery.  However, she did not undergo surgery; rather was treated with oral steroids, muscle relaxants, nonsteroidal antiinflammatory drugs, and rehabilitation over the past 10 years.  She states she experiences chronic lower back pain that flares up every month with her menses and is exacerbated by overuse. The monthly flare-ups are simply significant soreness in her lower back.  However, she states if she overuses her back, carries more than 20 pounds of weight, or sneezes or coughs just right she will have significant pain in the lower back causing loss of control of her bilateral lower extremities that requires at least two days of rest lying flat on her back with pillows under her knee.  She states during these periods she is able to stand and maneuver to the restroom.  However, must "baby it."  When she does have the severe lower back

5 - FINDINGS & RECOMMENDATION

> pain, it often times will radiate to her left lower extremity and she will have cramps in her left calf as well. She states over the past 10 years she has had approximately five flare-ups that have required complete bedrest for approximately two weeks. During these times, she is unable to walk, but reports being able to crawl. She also reports that she has bilateral lower extremity numbness when sitting in certain positions. However, this numbness is relieved when she gets up and moves around. She states that she is not able to squat due to her lower back pain and she is only able to stand for approximately one hour before her back begins to ache.

(A.R. 273-74) Whitney listed her current medications as Seroquel 300 mg at night, which she had just started taking one to two weeks earlier; Zoloft, currently being tapered; Ibuprofen 800 mg three times daily; and an Albuterol inhaler as needed. (A.R. 274)

Dr. Hills's examination revealed a woman in no acute distress, slightly disheveled, emotionally stable, who moved well, sat comfortably; and transferred from the chair to the examination table, walked about the room, and removed her shoes, all without difficulty. She had average ranges of motion; positive straight-leg-raising at 50 degrees on the right in a supine position, negative on the left; and positive on the right at 90 degrees in a sitting position, negative on the left. She had good grip strength, and no difficulty grasping and manipulating both large and small objects. (A.R. 274-76) She reported tenderness in her lumbar spine on palpation, and "objectively demonstrate[d] decreased light touch and temperature sensation on the dorsum of her left foot." (A.R. 277)

Dr. Hills diagnosed Whitney with "[l]ower back pain." (*Id.*) He noted the following conclusions from his examination:

6 - FINDINGS & RECOMMENDATION

> The number of hours [Whitney] could be
> expected to stand and walk in an eight-hour
> workday is approximately six hours with
> frequent breaks.
> The number of hours [she] would be able
> to sit in an eight-hour workday is not
> restricted.
> There are no assistive devices.
> The amount of weight [she] could lift or
> carry is approximately 10 pounds frequently
> and 10-20 pounds occasionally.
> There are no postural limitations on
> bending, stooping and crouching.
> There appear to be no manipulative limi-
> tations or relevant visual or communicative
> limitations. Workplace environmental limita-
> tions may include requiring appropriate lumbar
> support in a chair.
> Miss Whitney's lower back complaints are
> very characteristic for claimants with lumbar
> degenerative disk disease. Her physical exam
> is significant for positive straight leg raise
> on the right and it is likely that she
> requires further evaluation and would benefit
> from appropriate treatment. It is not unrea-
> sonable at this point to state the amount of
> time she spends standing or walking would be
> limited and the amount of time spent sitting
> would need to be interrupted by frequent
> breaks and assisted with appropriate lumbar
> support. In addition, she describes having
> bipolar disorder and while she is emotionally
> stable during my examination it is obvious
> there may be some component of disorganization
> as her clothing is soiled and her appearance
> slightly disheveled.

(A.R. 277-78)

On May 16, 2007, Whitney was seen in the aftercare program for followup of her bipolar disorder. She wanted to discontinue the Seroquel because it was "making her very lethargic." (A.R. 315) She was taken off Seroquel and Lamictal, for a trial of only Abilify at an upward tapering dose for two weeks. She was enrolled in an assistance program to help pay for the Abilify. (*Id.*)

X-rays of Whitney's lumbar spine on May 18, 2007, showed "Transitional situation[] of completely sacralized fifth lumbar

7 - FINDINGS & RECOMMENDATION

vertebra,"[3] and "Advanced degenerative change at the disc of the L4-5 level." (A.R. 279)

On May 30, 2007, psychologist Paul Rethinger, Ph.D. reviewed the record and completed a Psychiatric Review Technique form regarding Whitney. (A.R. 280-93) He evaluated Whitney's Bipolar Disorder under Listing 12.04, opining Whitney would have mild functional limitations in her activities of daily living, and moderate functional limitations in the areas of maintaining social functioning, and maintaining concentration, persistence, or pace. (A.R. 290) He noted no history of decompensation or emergency room visits, and noted Whitney's symptoms appeared to be under fair control with consistent treatment and medications. (A.R. 292)

Dr. Rethinger also completed a Mental Residual Functional Capacity Assessment form (A.R. 302-05), opining Whitney would be moderately limited in her ability to carry out detailed instructions, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. He did not find that Whitney would be significantly limited in any other work-related mental activity. (*Id.*) He opined Whitney "would do best performing tasks at a consistent and unrushed pace," limiting herself to completing "simple 1-2 step tasks on a consistent basis in a normal 40 hour work week." (A.R. 304) He further opined she should be "limited to occasional public and coworker contact." (*Id.*)

---

[3]"When the lumbar segment is completely sacralized," as noted by the radiologist (A.R. 279), "disc degeneration may occur at the spinal level immediately above it." B. Corrigan & G.D. Maitland, *Vertebral Musculoskeletal Disorders* 17 (1998) (available online at http://books.google.com/) (last viewed 11/30/2011).

8 - FINDINGS & RECOMMENDATION

Also on May 30, 2007, J. Scott Pritchard, D.O.[4] reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (A.R. 294-301) He opined Whitney would be able to lift up to fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit for about six hours, each, in an eight-hour workday; and push/pull without limitation. (A.R. 295) He opined she would be able to climb ramps/stairs, balance, kneel, and crawl frequently; and climb ladders/ropes/scaffolds, stoop, and crouch occasionally. (A.R. 296) He noted no other functional limitations. Dr. Pritchard noted Whitney had advanced degenerative disc disease in one segment of her lumbar spine, with "associated sclerotic changes about the end-plates"; however, she had "full lumbar flexion with normal gait/station/tandem." (A.R. 301) He noted Whitney engaged in a full range of daily activities, she had not sought consistent treatment for her back pain, and she only took over-the-counter medications for her back pain. *Id.* He disagreed with Dr. Hills's conclusion that Whitney would be limited to light work, instead opining she would be capable of a moderate range of functioning, with limitations on stooping and crouching. *Id.*

On June 4, 2007, Whitney was seen for followup in the mental health aftercare program. She was taking Abilify 20 mg/daily, and reported feeling very tired on that dosage. She was "sleeping late every day," felt agitated, and got angry easily. Her Abilify dosage was decreased to 15 mg/daily. (A.R. 314) She reported no

---

[4]Dr. Pritchard practices internal medicine. He has been a medical consultant for the Oregon Department of Disability Services since 1997. *See* http://www.dhs.state.or.us/nade/speakers.html.

9 - FINDINGS & RECOMMENDATION

new symptoms or complaints on June 14, 2007, and her Abilify dosage was continued without change.  (A.R. 313)

On November 20, 2007, internist Sharon B. Eder, M.D. reviewed the record and concurred with Dr. Pritchard's conclusions regarding Whitney's physical functional capacity.  (A.R. 317)  The same date, Peter LeBray, Ph.D., a clinical psychologist, reviewed the record and concurred with Dr. Rethinger's previous conclusions regarding Whitney's mental functional capacity.  (A.R. 318)  Dr. LeBray noted Whitney's mood was "more stable," and Whitney lacked any "clear cognitive deficits."  She also was noted to be "somewhat socially avoidant, rel[ying] much on her partner and given to bouts of irritability."  (A.R. 322)  Dr. LeBray recommended Whitney have a job not requiring close social interaction due to the possibility that she could be distracted occasionally by "affective distress." (*Id.*)

The record contains no further medical evidence of any treatment Whitney received during the closed period at issue in this case.  There is a significant gap in Whitney's medical records, from June 14, 2007, to November 18, 2009, when she was seen by Blake A. Nonweiler, M.D., an orthopedic surgeon, following a shoulder injury at work.  The record contains Dr. Nonweiler's treatment notes, as well as treatment notes from Marc A. Wagner, M.D., a physical medicine and rehabilitation specialist Whitney saw for pain management of her right shoulder pain.  Because these treatment records post-date the closed period at issue in this case by more than a year, they are not summarized here.

/ / /

/ / /

10 - FINDINGS & RECOMMENDATION

### B. Summary of the Vocational Evidence

Whitney has past relevant work as a heavy equipment operator for a paving company, a bartender/waitress, a car attendant for an auto detailing company, a gasoline attendant, a cashier, a motel housekeeper, a site attendant/supervisor at a family-owned landfill business, and a waste disposal attendant where she cleaned "porta-potties." (*See* A.R. 61, 150, 180)

From the VE's classification of these jobs, the ALJ concluded Whitney's past relevant work included "Heavy Equipment Operator, Paving Equipment Operator, Waste Disposal Attendant, and Cashier II." (A.R. 66) He noted her work history included both unskilled and skilled positions.    The ALJ asked the VE the following hypothetical question:

> For a first hypothetical, let's assume that this is a person who is capable of . . . essentially medium level work, that is to say a person who could lift 50 pounds occasionally and 25 pounds frequently, a person, who in the course of an eight hour work day, could stand and walk six hours and could also sit six hours.  This would be a person who would be capable of frequently climbing ramps and stairs, balancing frequently, frequently kneeling and frequently crawling.  A person who could occasionally climb ladders, ropes, and scaffolds.  A person who could occasionally stoop and occasionally crouch.  Let's also assume that this is a person who, during the relevant timeframe, would have been capable of unskilled work consisting of simple routine tasks with simple instructions.  A person who would have been limited to occasional contact with the general public and occasional contact with supervisors and coworkers.  If that were this person's, this hypothetical person's capabilities, would this person be able to perform any of the claimant's past relevant work?

(A.R. 66-67)

11 - FINDINGS & RECOMMENDATION

The VE responded that the hypothetical individual would be unable to perform any of Whitney's past relevant work, noting three of her past jobs were skilled, and the fourth, the Cashier II, required more than occasional contact with the public. (A.R. 67) However, the individual would be able to perform other work such as Sweeper/Cleaner Industrial, an unskilled, medium job; Assembler Small Products, an unskilled, light job; and Packager/Hand, an unskilled, medium job. (A.R. 67-68)

The ALJ then asked the VE to consider a second hypothetical:

> Once again, let's assume that this is a person who would be limited to unskilled work consisting of simple routine tasks with simple instructions. Once again, let's assume that this is a person who should have no more than occasional contact with the general public, no more than occasional contact with coworkers and supervisors. Let's assume that this is a person who could . . . lift ten pounds frequently and ten to 20 pounds occasionally, a person who, in the course of an eight hour work day, could stand and walk for six hours with frequent breaks, a person who's [sic] ability to sit would not be restricted in terms of time but who would require lumbar support for sitting. So bottom line is, this is a person probably with somewhat less than light lifting capability, a person who could stand and walk six hours but who would require frequent breaks and in terms of sitting, someone who would require lumbar support along with mental health limitations that I just went over. I assume, once again, past relevant work would be precluded for the same reasons?

(A.R. 68-69) The ALJ clarified that by "frequent breaks," he meant "a break of one to two minutes to stand and stretch every half hour in addition to the normal or typical breaks." (A.R. 69)

The VE indicated the second hypothetical individual would not be able to work at any of Whitney's past relevant jobs, or in the three jobs previously identified in response to the first

12 - FINDINGS & RECOMMENDATION

hypothetical question.  However, the individual would be able to work at other jobs including Assembler Semiconductor, a sedentary, unskilled job[5]; Surveillance Systems Monitor, a sedentary, unskilled job; and a Meter Reader, a light, unskilled job[6].  (A.R. 69-71)

Whitney's attorney asked the VE to consider the ALJ's second hypothetical, but with a moderate limitation in the ability to concentrate that would result in about a 20% reduction in productivity.  (A.R. 71)  The VE responded that there is virtually no job, of any classification, where a person remains on-task or is productive 100% of the time.  (A.R. 72)  However, if the individual's concentration difficulties would render the person incapable of performing routine, repetitive work, then the person would be unable to sustain gainful employment.  (A.R. 73)

Returning again to the ALJ's second hypothetical individual, if the individual "failed to show up for work about two days a month due to medical reasons," on an ongoing basis, the VE would deem that rate of absenteeism to be excessive for unskilled work, precluding employment.  (A.R. 74)

/ / /

/ / /

/ / /

---

[5]The VE noted the *Dictionary of Occupational Titles* ("DOT") was last updated in 1986, and indicated the Assembler Semiconductor job was semi-skilled.  However, more recent publications by the State of Oregon Employment Department indicated the job could be learned in 30 days or less, making it an unskilled job.  (A.R. 70)

[6]Similarly, although the DOT classifies the Meter Reader job as semi-skilled, more recent publications would classify the job as unskilled.  (A.R. 71)

13 - FINDINGS & RECOMMENDATION

### C.  Whitney's Testimony

#### 1.   Written testimony

On a Pain Questionnaire dated May 4, 2007, Whitney indicated she had a sharp, "pinching of nerve" type of pain in her lower back and down her legs.  She experienced the pain intermittently, anywhere from once or twice a month, to "2 or 3 weeks of the month."  (A.R. 177)  Lifting and carrying, standing for a long time, vacuuming, climbing stairs, sneezing, coughing, and cold weather all caused her to have pain.  Getting up from a seated position made the pain worse.  She got some relief from lying in a fetal position, or lying on the floor with her legs elevated. (*Id.*) She took Ibuprofen and Tylenol daily for the pain.  She could be up and active for about an hour before she needed to rest, but only rarely was she unable to finish a task she started.  She no longer was able to go hiking, an activity she used to enjoy.  She could walk one city block without resting.  She prepared her own meals. (A.R. 178-79)

On a Function Report, also dated May 4, 2007, Whitney described her daily activities as varied.  She usually got up, drank coffee, watched some television, and then did some type of household chore such as dishes, laundry, or vacuuming.  She watched more television and then fixed lunch, sat on her porch and smoked cigarettes, and sometimes read the newspaper.  She stated most of her day was "spent with pacing, somewhat lost and trying to figure out why."  (A.R. 192)  She had no difficulties with her personal care.  She indicated her conditions affected her sleep, but did not provide any explanation.  (A.R. 193)  She similarly indicated she needed reminders to take care of personal needs and grooming, but

14 - FINDINGS & RECOMMENDATION

failed to indicate what type of help or reminder was needed, or for what types of tasks.  (A.R. 194)  She did her own cooking and housework, and she did her own shopping, which took her an "hour or two." (A.R. 195)  She managed her own money, and drove a car.  She indicated she went outside "10-20 times a day to smoke."  (*Id.*)

She used to enjoy riding bikes, fishing, and camping, but she was unable to do those things anymore.  She felt she was less sociable, not wanting to be around anyone.  She had problems concentrating and remembering things.  On this form, she indicated she could walk a quarter mile before having to stop and rest, and she had to rest five minutes before she could resume walking.  She followed written and spoken instructions "pretty well." (A.R. 196-97)  She had become "afraid to work and drive and do things [she had] done before."  (A.R. 198)  She did not handle stress as well as she used to.  (*Id.*)

### 2.  *Hearing testimony*

At the time of the ALJ hearing, Whitney was 42 years old, 5'7" tall, and weighed about 125 pounds.  She was living in a house in Terrebonne, Oregon, with her 18-year-old daughter, and a roommate. Whitney has two other children, ages 20 and 25 at the time of the hearing, who did not reside with her.  (A.R. 39-40)

Whitney earned a G.E.D. in 1995.  She later completed a correspondence course in Landfill Management through Wisconsin University, and received a Certificate of Completion from the course.  When she was in middle school, Whitney was placed in remedial reading and math classes, but she is able to read and write.  (A.R. 40-41)

15 - FINDINGS & RECOMMENDATION

At the time of the hearing, Whitney was working at two jobs: as a Courtesy Clerk at a Safeway store, and as a Roller Operator for Central Oregon Pavers, the latter being a seasonal job. (A.R. 41-42, 55)   As a Roller Operator, she had to operate heavy equipment, "rolling the rock into the tack." (A.R. 55)   If she encountered a "large bump," she had to climb down off the equipment and try to rake or shovel the bump out smooth. (*Id.*)   When she finished her shift, her back would hurt. (A.R. 56)

Whitney was not working during the time period for which she seeks benefits, and she does not believe she was capable of working during that time due to back pain and depression. (A.R. 42-43) She did not have insurance, so she entered a research study to get medication for "bipolarism and depression." (A.R. 43)   She also received counseling as part of the program. (*Id.*)   Before she started in the program, she was experiencing "[m]anic highs and lows on a continuous basis." (A.R. 50)   She would cycle through the highs and lows "[a] couple of times a week," so each week, she would have a couple of good days and a couple of "really bad" days. (*Id.*)   When she was in a manic state, Whitney felt extremely positive, like she could "conquer the world." (*Id.*)   She had a lot of energy, great plans and goals, and believed she would "do just fine." (A.R. 50-51)   She did not get much sleep, and she had a problem with gambling.   When the manic episode ended, she would "crash."   She wanted to give up on everything, and her "head was full [of] garbage that was an impossibility, crying, suicidal thoughts." (A.R. 51)   She would lock herself in her room, not eat, and not want to talk to anyone.   Though she was tired, she was unable to sleep.   She had no ability to concentrate, and her

16 - FINDINGS & RECOMMENDATION

thoughts were negative and racing.  It was when she came close to suicide that she called to sign up for the medication study.  (A.R. 51-52)

When the medication study ended, Whitney continued to take the medications.  They helped her stop the high-low cycle and stopped her mind from racing.  (A.R. 52)  She was able to sleep better and rest better.  (A.R. 53)

During that time period, she had constant back pain, which she rated at a level of 5 on a 10-point scale.  However, she was not receiving any type of treatment for her back, and took only over-the-counter Tylenol for her back pain.  (A.R. 44-45)  She also did stretching exercises, and used Icy Hot, heat rubs, and thermal packs.  (A.R. 49)  Her pain would worsen if she sneezed or coughed, sometimes rising to the top of the pain scale.  When her pain was exacerbated to that degree, the severe pain would last "approximately a week or two." (A.R. 46)  To relieve pressure in her back, she had to lie on the floor on her back with her feet elevated. She had to "crawl to the bathroom." (*Id.*)  Whitney stated she had two such episodes during the nineteen-month time period at issue, where she was down for about a week each time.  She did not go to the emergency room because she could not afford it.  (*Id.*)

Other things that made her pain worse included weather changes; lifting something heavy, like a gallon of milk; and twisting the wrong way.  She sometimes would sleep wrong, and wake up stiff and in pain.  (*Id.*)  Stooping and kneeling actually helped her pain somewhat, relieving "the pinching." (A.R. 47)  If she had to perform a twisting movement, she had to twist her whole body; she could not leave her feet stationary and only twist her upper

17 - FINDINGS & RECOMMENDATION

body. (A.R. 46-47)  She stated she would have been unable to work at a job requiring repeated twisting motions, like stocking shelves.  (A.R. 47)

She could sit for ten to fifteen minutes before having to change positions, but for the most part, she was "constantly moving." (*Id.*)  She could stand for ten to fifteen minutes before having to rest, and walk for half a mile before resting, although she would be stopping to bend down and stretch her back during the walk.  (A.R. 48)  She had to pull herself up and down stairs using her arms because she lacked strength in her right leg.  When she tried to raise her right leg, it caused a pinching sensation in her low back, and sometimes her right leg would "give out."  (A.R. 48-49)  Her back pain radiated into both of her legs, and her legs would "go numb."  (A.R. 49)

Whitney stated she was unable to grocery shop regularly during the time period in question.  She prepared small meals and could do the dishes, but she could not sweep the kitchen or vacuum the floors due to pain.  She also could not scrub the bathroom, because "getting down, bending over, and scrubbing" were impossible for her.  (A.R. 53-54)  Her daily activities during this period consisted mostly of sitting and reading or watching television.  (A.R. 54)

She stated her back pain affected her ability to concentrate, noting it is "hard to focus on things when you're constantly moving and having to adjust your body just to keep that . . . certain pinch that you know is going to limit you from moving for quite a while."  (A.R. 55)

18 - FINDINGS & RECOMMENDATION

Whitney stated her current pain and limitations are largely unchanged from the closed period at issue. She still has the same kind of pain. Her attorney asked how she was working despite the pain, and Whitney responded, "[T]he difference is I have to survive[.]" (A.R. 48) However, she stated she is moving constantly, maneuvering her body so her back "doesn't pinch anymore." (A.R. 55)

The ALJ noted nothing had happened after June 30, 2008, that allowed Whitney to return to work. She had not had any surgery, physical therapy, or different medications, although she had started a new medication about three weeks prior to the ALJ hearing. Her back condition basically was the same during the closed period as it was at the time of the hearing when she was working two jobs. (A.R. 57-58)

With regard to her mental health condition, Whitney stated the support system she developed during the medication trial, and counseling she received as part of that program, made it easier for her to return to work. (A.R. 58)

### D. Third-Party Testimony

Whitney's friend and roommate, Gail L. Stadler, completed a third-party Function Report regarding Whitney on May 4, 2007. (A.R. 169-76) Stadler described Whitney's daily activities as drinking coffee in the morning, pacing back and forth, watching television "on occasion," and sometimes cleaning house. (A.R. 169) She indicated Whitney had chronic mood swings from one moment to the next. According to Stadler, Whitney's personal care had deteriorated. She bathed about twice a week, instead of daily; she

19 - FINDINGS & RECOMMENDATION

could not coordinate the colors of her clothing; she barely cared for her hair; she ate only twice a day or less; and she smoked up to two packs of cigarettes a day.  (A.R. 170)  She indicated Whitney used to keep up her hygiene, and she used to interact and socialize with others.  Now Whitney was forgetful, did not drive much, and suffered from insomnia and restlessness at night. (*Id.*)

Stadler indicated Whitney fixed herself simple meals like sandwiches, cereal, or some type of spread on crackers.  She stated Whitney had to be reminded to care for herself and her surroundings.  According to Stadler, Whitney lacked any patience and was too moody to interact and engage in normal conversation with others. (A.R. 171-72)  She stated Whitney occasionally walked or rode a bicycle, but Stadler did not know how often Whitney engaged in these activities. (A.R. 173)  She noted Whitney stayed at home most of the time, and preferred to be left alone. (*Id.*)  Stadler stated the phrase, "Doesn't play well with others," appropriately described Whitney. (A.R. 174)  In summary, Stadler indicated Whitney was "just not the same person [she] knew and met 2 years ago!" (*Id.*)

Stadler offered her opinion regarding Whitney's functional abilities.  She indicated Whitney could walk about half a block before needing to rest for five to ten minutes.  She estimated that Whitney's ability to follow written instructions was "pretty good," but her ability to follow oral instructions was "not so good." (*Id.*)  She opined that Whitney's back problems would affect all of her functional abilities, and her mental problems would affect her memory, concentration, ability to understand and follow instructions, ability to complete tasks, and ability to get along with

20 - FINDINGS & RECOMMENDATION

others.  (*Id.*)  She stated Whitney did not handle stress well at all, and she had noticed that Whitney feared losing further control over herself due to her illness.  (A.R. 175)

Stadler included the following narrative remarks: "My friend needs help do [sic] to her illness.  Please do what you can for her.  It's very heartbreaking to see such a drastic change in her moods and behaviors in such a short time!!  (I mean over the course of a 2-year spand [sic]!).  (A.R. 176)

### III.   *DISABILITY DETERMINATION AND THE BURDEN OF PROOF*

#### A.   *Legal Standards*

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula- tions?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)). The claimant bears the burden of proof for the first four steps in the process. If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony and also resolves any conflicts in the evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

22 - FINDINGS & RECOMMENDATION

1   Ordinarily, the ALJ must give greater weight to the opinions of

2   treating physicians, but the ALJ may disregard treating physicians'

3   opinions where they are "conclusory, brief, and unsupported by the

4   record as a whole, . . . or by objective medical findings." *Id.*

5   (citing *Matney, supra; Tonapetyan v. Halter*, 242 F.3d 1144, 1149

6   (9th Cir. 2001)).  If the ALJ disregards a treating physician's

7   opinions, "'the ALJ must give specific, legitimate reasons'" for

8   doing so.  *Id.* (quoting *Matney*).

9       The ALJ also determines the credibility of the claimant's

10  testimony regarding his or her symptoms:

11          In deciding whether to admit a claimant's
            subjective symptom testimony, the ALJ must
12          engage in a two-step analysis.  *Smolen v.*
            *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
13          Under the first step prescribed by *Smolen*,
            . . . the claimant must produce objective
14          medical evidence of underlying "impairment,"
            and must show that the impairment, or a combi-
15          nation of impairments, "could reasonably be
            expected to produce pain or other symptoms."
16          *Id.* at 1281-82.  If this . . . test is satis-
            fied, and if the ALJ's credibility analysis of
17          the claimant's testimony shows no malingering,
            then the ALJ may reject the claimant's testi-
18          mony about severity of symptoms [only] with
            "specific findings stating clear and con-
19          vincing reasons for doing so."  *Id.* at 1284.

20  *Batson*, 359 F.3d at 1196.

21

22                  **B.  The ALJ's Decision**

23      The ALJ found that Whitney had not engaged in substantial

24  gainful activity during the closed period at issue.  He noted,

25  however, that the end of her "alleged closed period of disability

26  coincides with her return to substantial gainful activity," and she

27  remained employed through the date of the ALJ hearing.  (A.R. 20)

28  He found, "While [her] earnings within the relevant closed period

23 - FINDINGS & RECOMMENDATION

are technically not substantial gainful activity, the fact that her earning ability increased significantly during the alleged closed period and that she was thereafter able to resume full-time employment on a sustained and competitive basis suggest[s] that she retained the ability to perform at least some basic work activities during the relevant closed period." (A.R. 20-21)

The ALJ found that during the closed period at issue, Whitney had severe impairments consisting of bipolar disorder, and degenerative disc disease of the lumbar spine. However, he found that these impairments, individually or in combination, did not reach the Listing level of severity, including Listing 1.04 (disorders of the spine) and Listing 12.04 (affective disorders). (A.R. 21)

With regard to Whitney's mental impairment, the ALJ noted she had mild restriction in the activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace. Her symptoms improved with medication, and she had no episodes of decompen- sation. The ALJ found that these levels of limitation did not satisfy the "paragraph B" criteria of the Listing. (A.R. 21-22) He further found that the evidence of record did not establish the presence of the "paragraph C" criteria. (A.R. 22)

The ALJ made the following observations about the process used to assess a claimant's mental residual functional capacity:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential

24 - FINDINGS & RECOMMENDATION

> evaluation process requires a more detailed
> assessment by itemizing various functions
> contained in the broad categories found in
> paragraph B of the adult mental disorders
> listings in 12.00 of the Listing of Impair-
> ments (SSR 96-8p). Therefore, the following
> residual functional capacity assessment
> reflects the degree of limitation I have found
> in the "paragraph B" mental function analysis.

(*Id.*) The ALJ then found that during the closed period, Whitney had the mental residual functional capacity "to perform a range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except due to symptoms of bipolar disorder or psychiatric medica-tion, she could perform simple, routine tasks that involved no more than occasional contact with the general public, co-workers, or supervisors." (A.R. 23) With regard to Whitney's chronic back pain, the ALJ indicated her work tasks "must involve no more than 6 hours of standing and/or walking during an 8-hour workday with regular breaks. Her capacity to sit is not restricted, so long as her seating includes lumbar support." (*Id.*)

The ALJ found that although Whitney's medically-determinable impairments reasonably could be expected to cause her alleged symptoms, Whitney's testimony regarding the intensity, persistence, and limiting effects of her symptoms was not supported by the objective medical evidence of record and, therefore, was not fully credible. (A.R. 24) On the issue of Whitney's physical limita-tions, the ALJ noted that simply because Whitney is unable to work without experiencing some pain and discomfort does not satisfy the test for disability. He found Whitney's credibility regarding her back pain was "undermined by the fact that she was able to cope with her pain symptoms without prescription pain medication. Additionally, [she] has since resumed full-time work without any

25 - FINDINGS & RECOMMENDATION

reported physical therapy or surgical intervention." (*Id.*)    The ALJ found these facts indicate Whitney's pain symptoms were not as severe as she alleged. (*Id.*)

In reaching this conclusion, the ALJ relied on Dr. Hills's findings and assessment, which he found to be consistent with the record as a whole.    In addition, the ALJ gave Dr. Hills's opinions the greatest weight because the doctor actually examined Whitney. (*Id.*)    He gave little weight to Gail Stadler's opinion regarding Whitney's physical limitations because he found her opinion to be inconsistent with the medical and other evidence of record. (A.R. 25)

With regard to Whitney's mental functioning, the ALJ made the following findings:[7]

> With regard to the claimant's mental func-
> tioning, the record documents [her] complaints
> of anger and irritability, as well as the full
> range of manic and depressed symptoms asso-
> ciated with bipolar disorder.    Licensed
> psychologist Wendy Bourg, Ph.D., noted that
> the claimant's mental symptoms interfered with
> her social relationships and effective work
> functioning.    Dr. Bourg did not, however,
> report that the claimant's mental symptoms
> precluded all work.    Treatment notes from the
> relevant period indicate that the claimant
> "responded well" to psychiatric medication, to
> the point that she became "virtually symptom-
> free."    The claimant demonstrated improved
> mood and was reported to talk and laugh "a
> lot."    I also note that the claimant's symp-
> toms, particularly fatigue and irritability,
> continued to manifest themselves later on –
> but the record documents improvement after
> adjusting medication and dosage. By June 2007,
> the claimant had no specific complaints

---

[7]Whitney argues the ALJ erred in almost every respect in his evaluation of her mental impairment.    The court therefore finds it useful to quote the ALJ's findings in full regarding his assessment of Whitney's mental functioning.

26 – FINDINGS & RECOMMENDATION

regarding her mental symptoms. This evidence suggests that the claimant's mental symptoms impose limitations on the complexity of tasks she can perform, as well as the social inter-action required by such tasks.  The claimant acknowledged at hearing, however, that the treatment and counseling she received from the clinical trial administered by Dr. Bourg helped improve her functional capacity to such an extent that she was able to return to work in July 2008.

State psychological consultants reviewed all available evidence in May and October 2007 and agreed that during the relevant period the claimant remained capable of performing simple tasks of 1-2 steps on a consistent basis, so long as such tasks involved only occasional contact with co-workers and the general public.  I give great weight to the assess-ments provided by the State agency psycho-logists, as they are generally consistent with the record as a whole.

I have reviewed the Third Party Function Report submitted by the claimant's friend, Gail Stadler, in May 2007.  Ms. Stadler's report of the claimant's . . . "chronic mood swings" [is] generally consistent with the evidence of record during the relevant period. I give partial weight to Ms. Stadler's obser-vations, to the extent they are consistent with the residual functional capacity found here.

(A.R. 24-25; citations to exhibits omitted)

The ALJ found that the demands of Whitney's past relevant work exceeded her residual functional capacity, and she was unable to perform her past relevant work during the closed period.  However, he further found that she could "perform a range of light work on [a] sustained and competitive basis subject to the limitations and restrictions set forth above," (A.R. 24), and she therefore could make a successful adjustment to other work that existed in significant numbers in the national economy, including semi-conductor assembler, surveillance monitor, and meter reader. (A.R.

27 - FINDINGS & RECOMMENDATION

25-26)  He therefore concluded Whitney was not disabled during the closed period at issue.  (A.R. 26-27)

#### IV.  STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'"  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions.  *Id.*  However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the court may not substitute its judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

/ / /

/ / /

28 - FINDINGS & RECOMMENDATION

1

## V.  DISCUSSION

### A. Evaluation of Mental Impairment

Whitney argues the ALJ failed to comply with the applicable regulations in his evaluation of her mental impairment. *See* Dkt. #15, pp. 8-13.  She argues the ALJ entirely failed to assess her mental residual functional capacity as required by 20 C.F.R. § 404.1520a(d), which provides that after the ALJ rates the degree of a claimant's functional limitation resulting from mental impairments, and determines whether or not any severe mental impairment meets or equals a listed impairment, then the ALJ must assess the claimant's mental residual functional capacity.

The ALJ found that Whitney's bipolar disorder during the closed period resulted in mild restriction in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace.  (A.R. 21-22)  He found that although the impairment was severe, it was not of Listing-level severity.  (A.R. 21)  Pursuant to the regulation, he then was required to assess Whitney's mental RFC.  20 C.F.R. § 404.1520a(d).  Whitney argues that instead of actually performing an assessment, the ALJ leapt directly to the conclusion that she possessed the mental residual functional capacity to perform a range of light work involving simple, routine tasks involving no more than occasional contact with the general public, coworkers, or supervisors.  (A.R. 23)  Whitney argues this mental RFC fails to address the ALJ's own finding that she possessed moderate limitations in concentration, persistence, or pace.  *See* Dkt. #15, pp. 8-10; Dkt. #20, pp. 1-2.  Whitney argues further that the ALJ failed to address how her moderate deficits in

29 - FINDINGS & RECOMMENDATION

maintaining concentration, persistence, or pace "may affect her ability to <u>sustain</u> unskilled work." Dkt. #20, p. 2 (emphasis in original).

The Commissioner argues the ALJ properly relied on the state agency consultant's Mental Residual Functional Capacity Assessment and Psychiatric Review Technique forms, as directed by the Agency's Program Operation Manual System (POMS) § DI 25020.010(B)(1).[8] The Commissioner cites *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008), in support of his contention that the ALJ was entitled to rely on the consultant's narrative opinion, in which Dr. Rethinger concluded Whitney "would do best performing tasks at a consistent and unrushed pace," limited to the completion of "simple 1-2 step tasks on a consistent basis in a normal 40 hour work week." (A.R. 304)

The Commissioner's argument is well taken. In *Stubbs-Danielson*, the plaintiff argued the ALJ's mental RFC finding failed to "capture the deficiency in pace and other mental limitations identified by [the medical sources of record]." 539 F.3d at 1173. The court disagreed, noting the ALJ had translated the claimant's limitations, including the limitation on pace, "into the only concrete restrictions available to him"; i.e., those contained in the consultant's narrative report. *Id.*, 539 F.3d at 1174. Similarly, in the present case, the only "concrete restrictions available" to the ALJ were those stated by Dr. Rethinger. The ALJ

---

[8]The Commissioner provided a Westlaw citation to the POMS that is not accessible under the court's, or many attorneys', subscription agreement. However, the POMS is available to the public on the Agency's website. *See* https://secure.ssa.gov/apps10/.

properly relied on Dr. Rethinger's written reports and narrative in finding Whitney could understand, remember, and carry out short, simple instructions on a sustained basis at an unrushed pace.  The ALJ concluded that Whitney possessed the mental residual functional capacity to perform a range of light work involving simple, routine tasks involving no more than occasional contact with the general public, coworkers, or supervisors.  This mental RFC assessment adequately captured Whitney's deficiencies in concentration, persistence, or pace.  *See id.*, 539 F.3d at 1174 (citing, *inter alia*, *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) "(where state psychologist both identified claimant as having deficiencies of concentration, persistence or pace and pronounced claimant possessed the ability to 'sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function,' ALJ's hypothetical including ability to perform 'simple, routine, repetitive tasks' adequately[] captured claimant's deficiencies in concentration[,] persistence or pace)").  Thus, the court finds the ALJ did not err in his assessment of Whitney's mental impairment during the closed period at issue here.

The parties overlook an additional justification for the ALJ's ultimate finding that Whitney's mental limitation did not result in a finding of disability during the closed period.  Even if one were to assume *arguendo* that Whitney's mental limitations were suffi-ciently severe to prevent her from working for a portion of the closed period, the record does not contain substantial evidence to support a finding that she was limited to that degree for a period of 12 months or more, as required for a finding of disability.  *See*

31 - FINDINGS & RECOMMENDATION

42 U.S.C. § 423(d)(1)(A). Whitney was at her worst, in terms of her bipolar disorder, at the beginning of the closed period, the first of November 2006, when she entered the clinical trial. By January 25, 2007, she reported being "virtually symptom-free." (A.R. 259) Although it took a few months to get her medications adjusted properly to relieve her fatigue, the record indicates this was accomplished by June 2007. From June 14, 2007, forward, there are no additional treatment records and no indication that Whitney's medications were changed. Nevertheless, by the following June, she felt able to return to full-time work. Thus, the record evidence indicates Whitney was severely limited by her bipolar disorder, if at all, only from November 2006 to June 2007.

### B. Credibility Assessment; Third-Party Testimony

Whitney argues the ALJ improperly rejected her testimony, and the third-party testimony of Gail Stadler. She argues the ALJ erred in failing to provide clear and convincing reasons for rejecting her subjective complaints. Dkt. #15, pp. 13-16.

In *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996), a case relied upon by Whitney, the court observed that SSR 88-13 directs an ALJ

> "to investigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as:
> "1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain [or other symptom];
> "2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

> "3.  Type, dosage, effectiveness, and adverse side effects of any pain medication;
> "4.  Treatment, other than medication, for relief of pain [or other symptoms];
> "5.  Functional restrictions; and
> "6.  The claimant's daily activities."

*Smolen*, 80 F.3d at 1284 n.8 (quoting SSR 88-13).  An ALJ also "may consider" whether a claimant has a reputation for lying, has made prior inconsistent statements, or has failed to seek treatment or to follow a prescribed course of treatment.  *Smolen*, 80 F.3d at 1284 (citations omitted).  An ALJ also must consider evidence concerning a claimant's prior work history, observations by treating and examining physicians, and observations by third parties.  *Id.*, 80 F.3d at 1285.

In the present case, the ALJ found that Whitney's medically-determinable impairments reasonably could have been expected to cause her alleged symptoms, and he made no finding that Whitney was malingering or previously had made inconsistent statements. (A.R. 24)  However, he found that Whitney's testimony regarding the intensity, persistence, and limiting effects of her symptoms was only partially credible, to the extent her allegations differed from the RFC as found by the ALJ.  (*Id.*)

As grounds for his credibility assessment, the ALJ found Whitney's subjective complaints were not fully supported by the objective medical evidence.  He noted that although her degenerative disc disease could result in "some chronic pain symptoms," the record did not contain "evidence of disc herniation, nerve root compression, or lumbar stenosis that commonly accompany disabling back pain"; she had normal motor strength, sensation, and reflexes; she walked without an assistive device, sat comfortably during her

33 - FINDINGS & RECOMMENDATION

examination, removed her shoes without difficulty, and transferred easily from a chair to an examination table; and she was able to cope with her pain symptoms using only over-the-counter medications.   (A.R. 24)   He found that the "combination of relatively benign objective findings and physical functioning [was] inconsistent with an individual who has severe, debilitating back pain." (*Id.*)   He further noted Whitney "[had] since resumed full-time work without any reported physical therapy or surgical intervention[,] . . . suggest[ing] that [her] pain symptoms were not as severe as she alleges." (*Id.*)   Thus, the ALJ cited specific evidence of record that he found contradictory to Whitney's allegations regarding the severity of her pain and limitations.

Regarding Gail Stadler's observations, the ALJ found "Stadler's report of [Whitney's] physical limitations and 'chronic mood swings' [to be] generally consistent with the evidence of record during the relevant period." (A.R. 25)   However, he discounted Stadler's opinions regarding Whitney's limitations to the extent they were inconsistent with the medical and other evidence of record. (*Id.*)

To the extent, if any, that the ALJ's assessment of Whitney's subjective complaints and of Stadler's third-party report failed to rise to the level of particularity required by Ninth Circuit case law, *see Smolen, supra*, and other cases cited by Whitney in her brief, Dkt. #15, p. 15, any such failure was harmless error.   As noted in the previous section of this opinion regarding Whitney's mental impairment, even assuming Whitney's physical symptoms were as severe as she alleges, the record evidence does not establish that those symptoms were disabling; i.e., that they lasted for a

34 - FINDINGS & RECOMMENDATION

1   period of 12 months or more.  The ALJ's ultimate determination that
2   Whitney was not disabled during the closed period is supported by
3   substantial evidence in the record, even if Whitney's and Stadler's
4   testimony is given substantial weight.

5

6                        **C.  Step-Five Finding**

7       Whitney argues the ALJ erred, at step five of the sequential
8   evaluation process, in finding she was able to perform the jobs of
9   semiconductor assembler, surveillance monitor, and meter reader.
10  She argues all three of those jobs require a level of reasoning
11  that is inconsistent with the ALJ's mental RFC finding that Whitney
12  was limited to simple, routine tasks involving only one or two
13  steps.  Dkt. #15, pp. 18-20.

14      The Commissioner notes Whitney has not cited any case law in
15  support of her claim that a person who can perform simple tasks
16  involving only one or two steps cannot perform jobs requiring a DOT
17  reasoning level of 3.  The Commissioner asserts that this court has
18  held "a claimant restricted to simple work can in fact perform
19  reasoning level 3 occupations."  Dkt. #17, p. 23 (citing *Wentz v.*
20  *Astrue*, No. CV08-661-PK, 2009 WL 3734104, at **13-14 (D. Or.
21  Nov. 4, 2009) (King, J.)).  The undersigned does not read the *Wentz*
22  holding as broadly as the Commissioner suggests.  The *Wentz* court's
23  holding was based on the specific evidence of record in the case,
24  where the ALJ's mental RFC was formulated "to accommodate mild
25  limitations in concentration, persistence, or pace due to
26  distractions from pain and the effects of sleep difficulties," but
27  expressly "was not based on deterioration in Wentz's cognitive
28  function[.]"  *Wentz*, 2009 WL 3734104, at #14.  Here, unlike in

35 - FINDINGS & RECOMMENDATION

*Wentz*, the record contains evidence that Whitney's cognitive functioning was deteriorated for a portion of the closed period.

The Commissioner further argues, however, that the DOT's "reasoning level" classification for the jobs identified by the VE is not controlling, and can be rebutted by contradictory expert testimony. Dkt. #17, p. 24 (citing *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995) ("We make explicit here that an ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation."). The ALJ specifically questioned the VE in this case about conflicts between his opinions regarding the skill level required for the cited jobs and that listed in the DOT. The VE explained that he was relying on more recent publications, including publications by the State of Oregon Employment Department, which indicated the identified jobs actually should be classified as unskilled. (A.R. 70-71) Because the VE gave a reasonable explanation for his deviation from the DOT, the ALJ was entitled to rely on the VE's opinion regarding jobs Whitney could have performed during the closed period. *See Massachi v. Astrue*, 486 F.3d 1149, 1152-54 (9th Cir. 2007).

The court finds the ALJ did not err in relying on the VE's testimony regarding jobs Whitney would have been capable of performing during the closed period at issue.


### *CONCLUSION*

The court has the power to enter a judgment affirming, modifying, or reversing the Commissioner's decision, with or without remand for further proceedings. 42 U.S.C. § 405(g). In

36 - FINDINGS & RECOMMENDATION

the present case, the record contains substantial evidence to support the ALJ's conclusion that Whitney was not disabled during the closed period. As a result, the Commissioner's decision should be affirmed.

### VII.   SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due by **February 6, 2012**. If no objections are filed, then the Findings and Recommendations will go under advisement on that date. If objections are filed, then any response is due by **February 23, 2012**. By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this 17th day of January, 2012.


   /s/ Dennis James Hubel
Dennis James Hubel
Unites States Magistrate Judge